## CALLAGHAN v. GOUVERNEUR et al.

(Court of Appeals of District of Columbia. Submitted November 15, 1923. Decided February 5, 1924.)

No. 1598.

Patents ⬅91(4)—Evidence held to show that junior party exercised due diligence in reducing invention to practice.

In an interference proceeding, in which the invention related to an electrical furnace of the heat-treating type, evidence that junior party, a subinspector of naval ordinance, was forbidden by government regulations from seeking outside aid with which to develop his invention, had no financial resources of his own, and was constantly engaged in the performance of his official duties, *held* to show that he exercised due diligence in reducing his invention to practice.

Appeal from the Commissioner of Patents.

Interference proceeding between Thomas F. Callaghan and Minor F. H. Gouverneur and others. From a decision awarding priority to the last-named parties, the first-named party appeals. Reversed, and priority awarded to first-named party.

W. T. Estabrook, of Washington, D. C., and A. J. Hudson, of Cleveland, Ohio, for appellant.

E. F. Mechlin, of Washington, D. C., for appellees.

Before SMYTH, Chief Justice, ROBB, Associate Justice, and MARTIN, Presiding Judge of the United States Court of Customs Appeals.

MARTIN, Acting Associate Justice. This is an appeal in a patent interference proceeding; the invention in question being one relating

to electrical furnaces of the heat-treating type. A brief explanation of the former art and the origin of the improvement will aid in a consideration of the case. The facts, of course, are taken as they appear in the record.

During the late war the government was compelled to procure in great haste large quantities of war supplies, among which three and four inch guns were important items. The manufacture of such guns began with billets of metal, and these were successively rough-turned, bored, and heat-treated. The latter process was effected by placing the gun upright in a vertical furnace and there subjecting it for a time to great heat. These furnaces, so far as this case goes, were heated by means of electricity. Prior to the present invention the furnaces were built with a circular shell of iron, lined inside with one or more walls made of heat-resisting and electrically insulating brick, with nichrome metal columns built into the interior wall at spaced intervals. These columns were studded with insulator spools, upon which was suspended nichrome ribbon, which was capable of great electrical resistance, and was the heating unit of the furnace. By means of outside conductors and switch control the nichrome ribbon could be charged with an electric current of high voltage, thus causing an intense heat within the furnace.

This form of construction, however, was defective in an important particular, for there was such a difference in the relative degrees of expansion of the columns, the ribbons, and the walls, under the varying temperatures, that breaks and short circuits were frequent. These, of course, necessitated delays at a time when haste was imperative. In response to this difficulty the present invention was severally conceived by the competing parties in this proceeding under substantially similar circumstances. The invention eliminates the metal columns as supports for the nichrome ribbons, and substitutes therefor projecting blocks composed of heat-resisting and electrically nonconducting material, built at spaced intervals into the walls of the furnace. The nichrome ribbon is then strung upon these blocks, without tension or danger of breaking. With this brief explanation, taken from the testimony, we copy the following four counts as illustrative, to wit:

1. An electrical furnace, comprising a wall, members having projections laid into said wall, and a resistor element looped on said projections in spaced relation to the wall and adapted to cover a given area of the wall.

2. An electrical furnace, comprising a wall having members built therein and provided with projecting portions, and a resistor element provided with loops and suspended in spaced relation to the inner surface of the wall by passing said loops over the projections.

3. In an electric resistance furnace, a furnace wall, supports carried by the wall upon the interior part thereof, and resistance material entirely supported by the supports and depending therefrom.

4. In an electric resistance heating furnace, a furnace wall, electric resistance material arranged as a series of loops adjacent the wall, and means engaging and supporting said loops only at the top portions of the loops.

The appellees, Gouverneur and Bulley, are the senior parties, and it may be stated at once that the testimony fully sustains all of their allegations concerning the history of their invention. On March 14, 1918, they conceived the invention, and then disclosed it to various

persons by means of oral descriptions and written sketches. On March 16, 1918, they made working drawings, and placed orders for materials with which to construct a furnace with the invention installed therein. On May 9, 1918, they completed the furnace. On June 6, 1918, they filed their application for a patent. On July 10, 1918, they put their furnace into successful operation.

Upon the other hand, in regard to the claim of Callaghan, it is established by the evidence as we view it, that he conceived the invention on or about September 12, 1917, and disclosed the same to various persons at that time and at other times soon thereafter. Again in June, August, September, and October, 1918, he disclosed the invention to different persons. As will appear hereafter, these persons were at the time his superior officers in the service of the government; and on October 23, 1918, he applied for a patent, with a consequent constructive reduction to practice. There was never an actual reduction to practice by Callaghan before that time. It thus appears that the invention was first conceived and disclosed by Callaghan, but was not actually reduced to practice by him before the filing of his application, and that Gouverneur and Bulley were first in the constructive reduction to practice. It is therefore clear that Callaghan cannot prevail in this appeal, unless it appears from the record that he was diligent in the matter between the time when the senior parties entered the field and the time of his constructive reduction to practice; and this we regard as the decisive question in the case.

The Examiner of Interferences decided that Callaghan was entitled to priority of invention. The Board of Examiners in Chief reversed the Examiner of Interferences, awarding priority of invention to Gouverneur and Bulley, on the ground that Callaghan was not diligent in reducing his invention to practice. The Commissioner sustained the Board of Examiners in Chief upon the same grounds.

It appears from the testimony that in July, 1917, the Bureau of Ordnance of the Navy Department entered into a contract with the Inland Ordnance Company of Bedford, Ohio, whereby the latter agreed to handle the production of 5,000,000 pounds of three and four inch gun forgings, with a proposed scheduled delivery of approximately 200,000 pounds per week. The contract was upon a "cost plus" basis, whereby the factory equipment necessary to perform the contract became and remained the property of the government. In August, 1917, Callaghan was appointed as a subinspector of naval ordnance, and in the following month he was assigned to duty at the Bedford factory of the Inland Ordnance Company. The latter company had already ordered the construction of four heat-treating electrical furnaces of the former type as part of the equipment for the performance of its contract. Thus Callaghan was compelled at once to consider the question of the efficiency of such furnaces, and he was led by a study of the subject to the conception of his invention in September, 1917.

There are several considerations which properly bear upon the question of Callaghan's diligence from that time to the time when he filed his application. In the first place, he was entirely without capital with which to further his invention, and was even lacking in means to pre-

pare and prosecute an application for a patent. Later he received pecuniary assistance for this purpose from Lieut. Uihlein, who for a time was Callaghan's superior officer at the factory. In the next place, Callaghan was absolutely forbidden by the orders of his superiors, and indeed by government regulations, from seeking outside aid in the development of his invention, as well as from talking about it to any person except his immediate superiors in the service. This situation effectually limited Callaghan's activities relating to the invention to the task of inducing his superior officers to permit him to install his inven-' tion in one of the electrical furnaces then in process of construction. He diligently attempted to secure this privilege, but failed in the effort. His superiors were not convinced of the feasibility of his invention, and moreover speedy production was so vitally important under the circumstances that they feared to depart from the then standard form of construction. Callaghan was simply a civilian employee of the Bureau of Ordnance, and as such was compelled to abide events.

In addition to these facts it appears that Callaghan was constantly and unremittingly engaged in the performance of his official duties in preparation for the production of the stipulated forgings for the government during the entire intervening period, and that this was a service of critical importance. The record does not justify the belief that Callaghan ever abandoned his intention of proceeding with his invention, but the peculiar circumstances which surrounded him at the time practically precluded him from doing anything with it, except through his superior officers, and he diligently endeavored to secure action in that manner. He failed, however, in this effort until after the inefficiency of the former type of furnace was proven by experience, when for the first time he received assistance from his superiors. This happened when, in August, 1918, Lieut. Uihlein became the officer in charge of the Bedford plant as assistant naval inspector of ordnance, thus becoming Callaghan's superior officer. Uihlein remained in that position until the middle of February, 1919. When he came to Bedford, he found the work seriously retarded by the failure of the heat-treating furnaces as above described. Callaghan was specially assigned to that part of the work, and he continued to insist upon the use of his invention as a remedy for the trouble. After consultation with his superior officers at Washington, Uihlein approved of the construction of a furnace at Bedford with Callaghan's invention installed therein, which however, was not completed until February, 1919. Uihlein also advanced money to Callaghan to assist him in securing a patent, and the latter was thus for the first time put in a position officially and financially to proceed with his invention.

It has been held in cases of this character that there is no arbitrary rule or standard by which diligence may be measured, but each case must be considered and decided in the light of the circumstances of that case; also, that the nature of the invention, the situation of the inventor, the length of time intervening between conception and reduction to practice, the character and reasonableness of the inventor's testimony and that of his witnesses, are all important factors in determining the question of diligence. Woods v. Poor, 29 D. C. App. 397; Sargent v. Vetter, 48 App. D. C. 582. It has been said that such dili-

gence does not require uninterrupted effort, nor the concentration of all the applicant's energies upon the single enterprise; that the health, the means, the liberty of the inventor are proper subjects for consideration in this regard; and that the law looks with indulgence upon the delays which arise from the circumstances of parties who may make an invention. Dickinson v. Swinehart, 49 App. D. C. 222; Courson v. O'Connor, 227 Fed. 890, 142 C. C. A. 414; Robinson on Patents, vol. 1, p. 547.

Guided by these authorities, we think that, in view of the unusual circumstances which surrounded Callaghan at the time of these transactions, including his proven lack of financial means, he cannot be said to have failed in the exercise of due diligence. We therefore hold that he was entitled to a decision in his favor upon the issue of priority.

The decision of the Commissioner is accordingly reversed, priority is awarded to Callaghan, and the case is remanded.