36 C.C.P.A.(Patents)

## GREGG v. COAKWELL.

### Patent Appeal No. 5597.

United States Court of Customs and
Patent Appeals.

June 28, 1949.

Herbert L. Davis, Jr., Washington, D. C.,
for appellant.

Evans & McCoy, Cleveland, Ohio (Frank
S. Greene, Cleveland, Ohio, of counsel), for
appellee.

Before GARRETT, Chief Judge, and
JACKSON, O'CONNELL and JOHN-
SON, Judges.

O'CONNELL, Judge.

The junior party, Gregg, appeals here
from the decision of the Board of Interfer-
ence Examiners of the United States Patent
Office, designated in the certified transcript
of the record as the Board of Patent Inter-
ferences, awarding priority of invention of
the subject matter defined by the single
count in issue to appellee, the senior party,
Charles A. Coakwell, Jr.

Appellant filed a petition requesting the
board to reconsider its decision. The board
granted the petition but upon reconsidera-
tion adhered without change to its original
decision.

The interference involves appellant's
pending application, No. 460,007, filed Sep-
tember 28, 1942, which has been assigned to
the Bendix Aviation Corporation, and ap-
pellee's pending application, No. 448,326,
filed June 24, 1942, for a patent for a
"Blackout-Preventing Device."

Each of the parties relies upon a
constructive reduction to practice. Appel-
lant is the junior party by approximately
three months and therefore the burden was
upon him to establish priority of invention
by a preponderance of the evidence. Both
parties filed briefs and were represented at
final hearing, but only appellant took testi-
mony. The attorney for appellee, however,

appeared and cross-examined appellant's witnesses.

■ Appellee admits prior conception by appellant, but since appellant did not reduce to practice before his filing date, the sole issue to be considered is whether appellant was reasonably diligent during the critical period, namely, for a time just before appellee entered thet field on June 24, 1942, until September 28, 1942, when appellant filed his application. Wilson et al. v. Sherts et al., 81 F.2d 755, 23 C.C.P.A. Patents 914, 924; Brown, Jr. v. Barton, 102 F.2d 193, 26 C.C.P.A. Patents 889, 894.

The count reads: "1. The combination, comprising constricting means to be worn about a portion of the body of an occupant of an aircraft, a conduit for conducting a fluid medium under pressure to operate said constricting means, acceleration responsive means for regulating the pressure of said fluid medium so as to increase the constricting force applied by said constricting means during recovery of said aircraft from a diving maneuver, and said constricting means arranged to be positioned about the body of the occupant in such a manner as to retard upon such increase in the constricting force thereof the drainage of blood from the brain of the occupant, whereby during the interval of recovery of the aircraft from said diving maneuver the occupant may be protected from loss of consciousness."

Appellant's device relates to certain new and useful improvements in a valve device and differs from that of appellee, as the board succinctly pointed out—"The invention herein involved relates to 'anti-blackout' devices for pilots of aircraft. When pulling out of a steep dive or making a tight banking maneuver, the blood of the pilot tends to drain out of the brain, resulting in a temporary blindness at a very critical moment. In order to combat this condition the present invention was evolved. The party Coakwell's device applies temporary pressure proportional to the need of the veins in the neck leading from the brain to block the drain-off, whereas Gregg's device applies the counter pressure further down in the region of the abdomen."

The testimony given by appellant Gregg disclosed that for about seventeen years he was employed as Chief Research Engineer by the Eclipse Aviation division of the Bendix Aviation Corporation of New Jersey; that on February 24, 1942, shortly after America had entered World War II, he disclosed his invention to David F. Doody, a patent lawyer employed in the patent department of the Bendix Corporation, who on that same day wrote and mailed a letter to the draftsman, Mr. Ford of New York City. In that letter Doody explained the invention, inclosed the sketch thereof made by appellant, and requested Ford to prepare the drawing to be filed with appellant's application for a patent.

Appellant at that time did not, however, prepare or file an application for a patent. Instead, he communicated by telephone and by letter with Fred D. Moller of the Ellsworth Manufacturing Company of New Haven which was already in the field producing anti-blackout equipment for pilots. Appellant also assigned certain employees of the engineering staff of the Bendix Aviation Corporation to make layout and schematic drawings in accordance with his disclosure. In that connection, appellant testified in answer to questions by counsel:

"Q. 153. In the third paragraph of Gregg Exhibit 16, Mr. Moller refers to a 'simplified valve.' Do you know whose valve Mr. Moller is referring to? A. I believe that was a valve which Mr. Moller was working on himself.

"Q. 154. For whose use was your 'G' valve control inflatable girdle shown in Gregg Exhibit 2 specifically intended? A. Specifically, the valve was designed for the Ellsworth Manufacturing Company. The use for the valve was for the protection of military pilots or flight personnel."

Before the drawings were completed appellant wrote and mailed a special delivery letter to Moller, dated March 6, 1942, in which appellant stated:

"Dear Mr. Moller:

"Confirming our recent telephone conversations on equipment for your pilots' anti-blackout devices, we have assigned to one of our engineers the job of preparing drawings of the oil separator, 'G' valve, differential pressure valve and distributor valve which we would propose submitting for this purpose. These drawings will be available Monday morning and in accordance

with our discussion we will mail one set to Mr. Gerhardt at the Bureau of Aeronautics and one set to your attention at your office in New Haven.

"We will build one set of this equipment either for you or for the Navy for test purposes without charge and quote a price of $350. per set for an order of twenty-five (25) sets of this equipment. We are, as we have already advised you, absorbing both the experimental costs and a portion of the production costs in order to make possible this price of $350. We believe that we can have one set of experimental equipment ready for your tests within forty-five (45) days and can start delivery on the twenty-five (25) sets within ninety (90) days of the approval of the first set of equipment.

\*    \*    \*    \*    \*    \*

"We appreciate very much the opportunity of cooperating with your company and with the Navy Department in this development and hope that we will be successful in receiving an order for the twenty-five (25) sets of units. We will, of course, be only too happy to cooperate with you to the fullest extent in developing this equipment to meet your particular needs.

"Very truly yours,
"David Gregg
"Chief Research Engineer
"Eclipse Aviation"

The contents of the letter hereinbefore set forth and the contents of other letters hereinafter reproduced have a critical bearing on the question here in issue.

On March 11, 1942, appellant wrote a supplementary letter to Moller in which appellant disclosed the details of his invention and inclosed a copy of the layout and schematic drawings hereinbefore described. Appellant at the same time wrote to the Navy Department and inclosed a copy of the drawings he had sent to Moller, together with a copy of appellant's letter to Moller. To that letter the Navy Department on March 23, 1942, made the following reply, portions of which we here emphasize:

"My dear Mr. Gregg:
"The receipt of your letter with the general arrangement drawings of the anti-

blackout suit operating equipment is acknowledged with thanks. From preliminary study, it is believed that your design is basically sound and that the equipment may function satisfactorily in use.

"Equipment of this nature is being obtained by the bureau from the Ellsworth Manufacturing Company, and it is understood from Mr. Moller of that company that you are aware of the present status of proposals. Inasmuch as the entire development is comparatively new, the equipment proposed may be subject to definite improvement, and certainly should lend itself to different or more simplified design. Accordingly, it is believed that an additional set of equipment of your design may be a desirable addition to the test program.

"Since the bureau in dealing through the Ellsworth Manufacturing Company as prime contractor for the original contemplated purchase, it is desired that you deal through that company, at least for the time being, keeping the bureau advised of the state of development should a change in policy be warranted.

"Your interest in this problem is greatly appreciated, and you may be assured that the bureau will advise you of any desired features of design that arise in the near future.

"Very truly yours,
"E. D. Gerhardt
"Lieutenant (jg) U. S. N. R.
"By direction Chief of Bureau"

Appellant again wrote the Navy Department on receipt of its letter and stated he would definitely like to cooperate. Moller did not reply to appellant's letter of March 11, 1942, and appellant on March 27, 1942, sent the following reminder:

"Dear Mr. Moller:
"With reference to our letter of March 11th, 1942, to you with which we forwarded drawings showing the proposed anti-blackout control unit, a duplicate set of these data was forwarded to the Bureau of Aeronautics, Navy Department, Washington, D. C. under the same date. We have received their letter dated March 21st advising us that they 'believe our design to be basically sound and that the equipment may

function in use'. They also believe that further development toward a more simplified design should be continued and have assured us that they will advise of any desired features of design that arise in the future.

"May we have your comments on our letter of March 11th?"

"With kindest personal regards.

"Very truly yours,
"David Gregg
"Chief Research Engineer
"Eclipse Aviation"

On May 22, 1942, Moller responded in a letter, referring to a talk which he had had with appellant, and stating:

"Dear Dave:

"Many thanks for the photostatic copy of Figure 3 in technical note No. 593 of the National Advisory Committee for Aeronautics.

"Since talking with you I have been to Washington, secured approval of our amended contract and we are going ahead with that equipment to be further tested. Hope to arrive at some very definite conclusions in the next four or five weeks and will then be in a position to specify exactly what is required in the way of valve equipment.

"We hope to settle on only one type of valve equipment, probably the more simplified unit but there is reason to believe that the other equipment will be adapted for another type of work.

"Don't know whether or not you have had time to give this any more thought, but when all the 'fooling around' is over, will look forward to sitting down with you and discussing the ultimate requirements.

"With kindest personal regards—
"Cordially yours,
"The Ellsworth Manufacturing Company
"Fred Moller"

On June 3, 1942, Moller wrote a further letter to appellant and stated:

"Dear Dave:

"Just a note to keep you posted on progress and our continued interest in a simplified valve which would give us a gradient of pressure such as I have discussed with you.

"Everything is progressing nicely and, after spending three days in Washington last week, I am convinced that interest in the equipment is genuine and the anxiety to expedite the entire program will help greatly in cutting through some of the usual 'red tape'.

"The development of a simplified valve to give that gradient of pressure has not been too successful. I am afraid we are going to have to use a rather heavy combination of valves to produce the desired results. If tests during the latter part of July prove this equipment to be as satisfactory as we anticipate, I would like to call on your ingenuity and that of your engineering staff to work out the details of the ultimate valve system unless, of course, something is 'pulled out of a hat'. in this development program down here but, at the moment, it looks rather doubtful.

"With all good wishes and personal regards—

"Sincerely yours,
"The Ellsworth Manufacturing Company
"F. D. Moller"

"FDM: 14

"P. S. Must go out Wright Field next week. Am wondering if your schedule will be taking you out. If so, we'd have a good chance to talk.

"Fred"

Moller's letter of June 3, 1942, appears to have been the last communication relative to the subject matter here in issue, as noted by the following testimony given by appellant:

"Q. 165. What were you led to believe, from the letter June 3, 1942, Gregg Exhibit 16? A. That sometime during the latter part of July we would be advised by the Ellsworth Manufacturing Company regarding their specific requirements, and would work out the exact details of the valve with them.

"Q. 166. Did you hear anything further? A. I am not certain whether that is the last letter or not. I think it is.

"Q. 167. Did you check your records? A. Yes.

"Q. 168. Did you find any other letters? A. I do not recall any other letter beyond this date.

"Q. 169. After receiving no further word, what did you then do in this matter? A. We waited until the anticipated time of a reply was past, and, as we heard nothing further from them, we filed a patent application on the device which I had invented.

"Q. 170. Are you the David Gregg the applicant in application File No. 460,007, which is involved in the present Interference? A. I am."

Upon the evidence hereinbefore recited the board in awarding priority to appellee made the following decision:

"It is considered that the elements of this picture do not add up to reasonable diligence in the critical period of filing an application. The Patent Office drawing was ordered in Gregg's behalf in February, 1942, and the specification excluding the claims need not have involved much amplification other the description sent the draftsman. In other words, since the Patent Office drawing ordered in September, 1942, [February 24, 1942] was going to be the eventual basis of the application, the application could just as well have been filed in March, 1942, as later. While the directions of the Navy may have justified Gregg in relying upon Ellsworth for construction and testing for a short period, its (Ellsworth's) dilatory responses, the fact that it was testing other equipment than Gregg's and the fact known to Gregg (Q. 153, p. 61, G.R.) that it was working on and testing a valve of Moller's should have aroused Gregg to file quickly rather than delay. The non-committal letter of June 13, 1942, [June 3, 1942] from Moller certainly contained nothing to encourage Gregg to delay filing on the original form conceived by him. It is consequently our considered opinion that Gregg was not reasonably diligent just before the filing date, June 24, 1942, of Coakwell or in the ensuing period to September 28, 1942, when Gregg filed."

The board in support of its position, among other things, pointed out that appellant's device was comparatively simple, that it would have weighed only a few pounds, was relatively inexpensive, and that Bendix knew it could build the device within 45 days; and, finally, that Bendix had its own patent department which apparently could have filed promptly if it so desired.

█ This court in considering the question of reasonable diligence made the following holding in the case of Benjamin W. Jones v. Clarence T. Evans, 46 F.2d 197, 202, 18 C.C.P.A. Patents 866; 874, "The law, while it encourages and requires diligence in reduction to practice and in making application for patent, also admits of such delay in making application for patent as is reasonably required to test the thoroughness and utility of supposed inventions, and to prevent the Patent Office from being overloaded with applications for patents for crude and incomplete devices. Such has been the uniform holding of the Court of Appeals of the District of Columbia, the court having earlier jurisdiction of these matters, a holding in which we concur. Yates v. Huson, 8 App.D.C. 93; Griffin v. Swenson, 15 App.D.C. 135; O'Connell v. Schmidt, 27 App.D.C. 77; Woods v. Poor, 29 App.D.C. 397, 403."

Matters which may be properly considered in reaching a conclusion as to whether an applicant for a patent has exercised reasonable diligence in filing his application where delay has occurred were stated to the following effect by the Court of Appeals for the District of Columbia in the case of Callaghan v. Couverneur et al., 54 App.D.C. 140, 143, 295 F. 961, 964: "It has been held in cases of this character that there is no arbitrary rule or standard by which diligence may be measured, but each case must be considered and decided in the light of the circumstances of that case; also, that the nature of the invention, the situation of the inventor, the length of time intervening between conception and reduction to practice, the character and reasonableness of the inventor's testimony and that of his witnesses, are all important factors in determining the question of diligence. Woods v. Poor, 29 D.C.App. 397; Sargent v. Vetter, 48 App.D.C. 582. It has been said that such diligence does not require uninterrupted effort, nor the concentration of all the applicant's energies upon

the single enterprise; that the health, the means, the liberty of the inventor are proper subjects for consideration in this regard; and that the law looks with indulgence upon the delays which arise from the circumstances of parties who may make an invention. Dickinson v. Swinehart, 49 App. D.C. 222, [263 F. 474]; Courson v. O'Connor, 227 F. 890, 142 C.C.A. 414; Robinson on Patents, vol. 1, p. 547."

Appellee urges that the record is barren of any proof establishing that appellant's device was ever actually reduced to practice by himself, his assignee, or by any one else; that in appellant's letter of March 6, he and his assignee apparently attempted to shift the expense of testing appellant's device to the Ellsworth Company; that Ellsworth was both dilatory and noncommittal in its replies to appellant; that there is nothing in any of Ellsworth's letters to indicate that Ellsworth had built or intended to build or test any part of appellant's device; that references in the letters of Ellsworth to appellant to talks previously had with appellant are vague and inconclusive; that there is no evidence in the record that Ellsworth ever did produce a successful anti-blackout device, with or without the aid of appellant's suggestions; that appellant and his assignee did nothing toward either an actual or constructive reduction to practice between March 27, 1942, almost three month's before appellee's filing date of June 24, 1942, and for three months thereafter to September 28, 1942, when appellant finally filed the application here involved.

Appellee further urges that there is no evidence in the record that appellant's assignee did not have the material necessary to reduce appellant's invention to practice, but on the contrary the evidence indicates that there was actually no difficulty on the part of appellant and his assignee to build and reduce his invention to practice; and that there is no evidence in the record of any statute, executive order, or Government directive which would have prohibited or even hindered appellant and his assignee from doing the work necessary to reduce appellant's invention to practice, either actual or constructive.

Appellant urges that the board erred in its decision in that it failed to take judicial notice of the fact that throughout the period intervening between February 24, 1942, when appellant conceived the invention in issue, and September 28, 1942, when appellant filed his application, the United States was engaged in World War II; that the board failed to give proper weight to the fact that appellant disclosed his invention to the Navy Department prior to the filing date of appellee's application; that the desire expressed in the letter of the Navy Department that appellant should deal through the Ellsworth Company in the testing of his device was in time of war tantamount to a command to appellant from the sovereign power; that accordingly appellant and his assignee were within their rights in considering that whatever was done by the Navy Department, Moller, and the Ellsworth Company must inure to the benefit of appellant, and hence there was no cause "to file quickly" as the board stated; that Ellsworth's letters were such as would have led a reasonably diligent person to the conclusion that Ellsworth was diligently going ahead with the development of appellant's invention; that during the World War II a situation prevailed wherein the invention defined by the count in issue would be used only by the Government for the protection of its military pilots, dive bombers, and fighter pilots; and that under the circumstances, as stated in appellant's brief, "there is no rule which requires under such circumstances that the inventor rush to the Patent Office during the war period in order to preserve his rights as the first inventor."

██ Appellant's disclosure to the Navy Department does not under the authorities eliminate the necessity of proving diligence on his part nor constitute a constructive reduction to practice. See Automatic Weighing Mach. Co. v. Pneumatic Scale Corp., 1 Cir., 166 F. 288; Harper v. Zimmermann, 3 Cir., 41 F.2d 261, and authorities therein cited and reviewed. Moreover, it was a matter of common knowledge in patent circles during the recent World War that the armed forces of the Government had stationed experts in the Patent Office to re-

view and appropriate the subject matters of applications which pertained to the conduct of the war.

Appellant was a pilot in the United States Air Corps attached to the Royal Flying Corps with the English Army in 1917-1918 and retained a military rating as an airplane pilot until about 1942 when he resigned his Army commission and accepted a commission in the United States Navy. Such a person might have understood the request of the Navy Department as a command to do nothing to reduce his invention to practice by actual tests thereof. No satisfactory explanation has been offered, however, why appellant failed to file his allowable application for a patent in due course and by that simple expedient secure his rights as first inventor, particularly in view of the statement by the Navy Department that the invention was one of merit. That there was no objection from a military point of view to such procedure is apparent from the fact that appellant did file while the war was still on and a long way from completion.

The cases relied upon by appellant are not controlling for the reason that the factual situations in those cases differ essentially from that disclosed by the record in this case. Moreover, the applicants therein did not have the same high rank in the art as appellant had nor did they have at their command the benefit of an experienced department specializing in patent law.

■ For the reasons hereinbefore stated, we are compelled to concur in the views expressed in the decision of the board to the effect that appellant did not sustain the burden of proof required of him as to the exercise of reasonable diligence during the critical period. In view of that conclusion, it is deemed unnecessary to discuss all the points presented by counsel for the respective parties, and the decision of the board appealed from is accordingly affirmed.

Affirmed.

By reason of illness, HATFIELD, Judge, was not present at the argument of this case and did not participate in the decision.