Whitaker, Judge,
delivered the opinion of the court:
Plaintiff sues for the infringement of his patent on an anti-blackout device (United States Letters Patent No. 2,676,586). The patent was applied for on June 24, 1942, and was issued on April 27,1954.
Defendant asserts that plaintiff’s patent was anticipated by the prior art and prior knowledge and is, therefore, invalid. This is defendant’s chief defense. It also says that plaintiff’s patent must be limited to the particular embodiment of it as disclosed by the drawings and specifications and that, as so limited, its device did not infringe it.
The apparatus on which plaintiff secured a patent was designed to prevent a condition known as “blackout” which fighter pilots experienced while maneuvering an airplane in a sharp turn or while recovering from a dive. The embodiment illustrated in the patent included a bellows filled with fluid, in the center of which was a plunger. When this plunger was forced downward it constricted the bellows and *195 thus forced out the liquid contained therein. This liquid under pressure was transmitted through rubber hose to selected portions of the body of the pilot of an airplane, thereby applying pressure to the blood vessels in such portions of his body, thus preventing the accumulation of blood at such portions and minimizing the draining of blood from the pilot’s head.
There was attached to this plunger a crossbar, pivotally attached at one end to the structure containing the bellows filled with fluid; at the other end there was attached a weight. When the direction of the airplane was changed suddenly, this weight tended to continue in the former direction, which forced down the plunger and, in turn, forced the liquid out of the bellows and applied pressure to the desired portions of the pilot’s body.
This sudden change of direction of an airplane occurs when a pilot pulls the plane out of a dive or makes a sharp “bank”. Such a sudden change in direction causes an increase in the forces acting on the pilot’s body. This increase in the normal pull of gravity on the pilot’s body, known as g, is produced by the momentum of the body tending to move in the former direction of the plane. Plaintiff’s device is designed to operate automatically in response to an increase in g, and thus to automatically apply increased pressure to the desired portions of the pilot’s body when there is an increase in g.
The specifications thus describes the objects of the invention:
In maneuvering fast fighting planes during the course of an air battle, sharp banks and turns at high speed are often necessary to escape the fire of enemy craft. But such turns are highly dangerous because sudden changes in the direction of movement of the pilot’s body may so accelerate the flow of blood through the veins leading from the head as to drain the blood from the pilot’s brain to an extent such that the optic nerves are affected and the pilot becomes temporarily blind. The apparent increase in the weight of a body carried by a plane due to its inertia during recovery of the plane from a diving maneuver is commonly referred to as an increase of g and the present invention provides means automatically *196 operative upon an increase of g for impeding tbe flow of blood from tbe pilot’s brain to prevent blacking out.
Tbe present invention has for its object to provide acceleration responsive means for retarding tbe venous flow of blood from tbe bead during sharp turns so as to increase tbe pilot’s resistance to blacking-out.
A further object of the present invention is to provide a pressure-applying device which is automatically controlled by turning movements of the plane such that there is an increase in the thrust of the pilot’s body against the seat due to inertia.
No claim is made that claim 1 of the patent has been infringed by defendant, but for a better understanding of the issues, it is desirable to state what is claimed therein. It called for the application of the increased pressure to the veins of the pilot’s neck, and the specifications, describing an embodiment of it, call for the application of the pressure on the neck. The specifications are set out in the findings.
The original application did not specifically describe the applicaton of pressure to any portion of the body except the neck, and the specifications describe such a device. However, the Patent Office Examiner suggested a claim that was not limited to the neck as the place for the application of pressure. The patentee then added claim 2, which did not restrict the application of pressure to the pilot’s neck; it called for its application to “a portion of the body,” without specifying what portion. It reads, with indentations and emphasis added to facilitate an understanding of it:
The combination, comprising
(a) constrictmg means to be worn about a portion of the body of an occupant of an aircraft,
(b) a conduit for conducting' a fluid medium under-pressure to operate said constricting means,
(c) acceleration responsive means for regulating the pressure of said fluid medium so as to increase the constricting force applied by said constricting means during recovery of said aircraft from a diving maneuver and
() said constricting means arranged to be positioned about the body of the occupant in such a manner as to retard upon such increase in the constricting force thereof the drainage of blood from the brain of the occupant,
*197 (a2) whereby during the interval of recovery of the aircraft from said diving maneuver the occupant may be protected from loss of consciousness.
Claim 6 differs from claim 2 only in that it specifies that the increase in pressure on the desired portion of the body is in proportion to the increase in g.
Claim 7 prescribes, in addition, means for limiting the pressure applied to the body.
Claim 5 differs but little from claim 2, with the additional features of claims 6 and 7. It is stated as set out in finding 12.
In support of its claim that plaintiff’s patent was anticipated by the prior art and prior knowledge, defendant relies primarily on the alleged knowledge and disclosures of Dr. Ferwerda prior to plaintiff’s application. Prior to plaintiff’s application on June 24, 1942, Dr. Ferwerda had tested a device by flights at Anacostia in January 1942, and in April he tested it by centrifuge and by flights in Canada. He continued working on and testing his device after plaintiff’s application was filed, and it was not until August 26, 1944, that Ferwerda applied for a patent. One of the claims made in his application was identical with claim 2 of plaintiff’s patent. Plaintiff’s application was still pending when Ferwerda’s application was filed, and the Patent Office instituted interference proceedings between plaintiff, Ferwerda, and others, to determine who was the first inventor. The Board of Interference Examiners found that plaintiff was. This was the final determination of the Patent Office.
From this action of the Patent Office, an aggrieved applicant has the choice of two remedies: he can either seek review of the action by the Court of Customs and Patent Appeals, or he can file a complaint in the District Court to set the action aside. Plaintiff chose the latter remedy.
The District Court dismissed the Ferwerda complaint because it was filed too late, and the dismissal was affirmed by the Court of Appeals, Sixth Circuit, 220 F. 2d 752. Having resorted to the District Court, Ferwerda could not then seek relief from the Court of Customs and Patent Appeals. Therefore, the action of the Patent Office, holding that plaintiff was the first inventor, was final.
*198 It is obvious that a decree of the District Court upholding the action of the Patent Office, affirmed on appeal, would be a final adjudication of the question and would be res ad ju-dicata in all other courts, and defendant would not be heard to say in this court that plaintiff was not the first inventor. Where the losing party fails to effectively review the Patent Office action in one of the courts and it becomes final, it is equally binding on the parties. It has the same finality as the judgment of either of the courts would have had if one of them had reviewed it. Morgan v. Daniels, 153 U.S. 120 ; see also Radio Corporation of America, et al., v. Radio Engineering Laboratories, Inc., 293 U.S. 1.[1]
Technically, of course, the interference proceedings were between Ferwerda and plaintiff, but Dr. Ferwerda was a flight surgeon in the United States Navy, and under the law the Government has a free license on patents on his inventions made while so employed. Because of this, defendant, through counsel, actively participated in the interference proceedings and in the proceedings hi the District Court. While not a party technically, its interests were at stake — ■ Ferwerda’s interests were its interests — and it actively undertook to protect those interests. It was afforded full opportunity to do so. Therefore, it has had “its day in court.” It had the opportunity to present before the Patent Office and the District Court all the facts and advance all the arguments presented here. It is this opportunity that is the basis of the rule of res adjudicata. We think it should be applied here. Defendant should not be permitted to relitigate an issue already litigated and finally decided.
But, if we are wrong in this, to say the least, the unsuccessful party in the interference proceedings must show by the most convincing evidence that the decision of the Patent Office was wrong. The Supreme Court in Morgan v. Daniels, supra, at page 125, said:
Upon principle and authority, therefore, it must be laid down as a rule that where the question decided in *199 the Patent Office is one between contesting parties as to priority of invention, tbe decision there made must be accepted as controlling upon that question of fact in any subsequent suit between the same parties, unless the contrary is established by testimony which in character and amount carries thorough conviction. Tested by that rule the solution of this controversy is not difficult. Indeed, the variety of opinion expressed by the different officers who have examined this testimony is persuasive that the question of priority is doubtful, and if doubtful the decision of the Patent Office must control.
It also said:
It is a controversy between two individuals over a question of fact which has once been settled by a special tribunal, entrusted with full power in the premises. As such it might be well argued, were it not for the terms of this statute, that the decision of the Patent Office was a finality upon every matter of fact.
But, from aught that appears, Dr. Ferwerda’s early 1942 device was based on a different idea than plaintiff’s. The essence of his invention was to apply a massaging action to the pilot’s limbs by successive and intermittent inflations of a series of small bladders on the pilot’s limbs.
There was also an abdominal belt, but the pressure applied here was constant, in contradistinction to the essence of plaintiff’s invention, which was an increase in pressure in proportion to the increase in y, and a relaxation of it with the cessation of the additional g force.
Ferwerda’s reports disclose no valve that clearly operated in response to an increase in g. The mechanism of the anti-blackout suit Ferwerda designed for the pilot was not to apply pressure to parts of the pilot’s body in response to an increase in g. Save for the abdominal belt, it was designed to produce a massaging action.
Dr. Ferwerda testified that in the tests he conducted in January and April 1942 he employed the principle of applying increased pressure to parts of the body in response to an increase in y, but in his reports on these tests he does not mention this. One of the photographs attached to his report is labelled: “Anti-Blackout Equipment — Acceleration and Altitude Valve,” but the details of this valve are not shown, nor does it explain how the valve works.
*200 The flight test data in tabular form includes an insertion “Gr. valve used” in the column headed “Keaction,” but this is all. There is no description of the valve nor any statement of its purpose. Nor was the “Acceleration and Altitude Valve” shown on the diagrams of the equipment, which were attached to his reports.
Nothing in the early 1942 test report could be considered a disclosure of plaintiff’s invention.
Dr. Ferwerda began development work on his anti-blackout device not later than 1941, and he did not apply for a patent on it until August 26, 1944. Just when he used a valve to apply pressure to parts of the body in response to an increase in g, it would be very difficult for him to say, we should think, unless the date was established by one of his reports. His reports do not establish that he conceived of such a device as plaintiff’s and put it to practice or disclosed it prior to plaintiff’s application for patent. The evidence to show that the decision of the Patent Office was wrong falls far short of being thoroughly convincing, within the rule of Morgan v. Daniels, supra.
Defendant also says that the magazines “Flight” and “Scientific American” in 1933 disclosed the invention defined in the several patent claims. The claims here in suit recite acceleration responsive means for regulating the pressure, for maintaining a pressure proportional to the increase in g, means for limiting the pressure, for adjusting the maximum pressure applied, and a weighted member operating some means for varying the pressure. The pivoted scoop described in these prior magazine articles is not a means for applying pressure in response to an increase in g. Such a scoop, if operable, merely collects air under pressures determined by flight speed rather than pressures determined by acceleration forces.
Defendant also says that the claims of plaintiff’s patent must be limited to the embodiment of it shown in the specifications. This is clearly erroneous. The specifications showed, and claim 1 called for the application of the pressure to the pilot’s neck, but, as pointed out above, the other claims were not so limited. The claims determine the extent of the patent. The specifications do not limit the claims. They do *201 no more than set out one embodiment of the invention. It is too well settled to require the citation of authority that the patentee is not limited to the embodiment shown.
Defendant suggests other defenses, but its main reliance is upon those discussed above. We think it unnecessary to discuss the others, since they are adequately dealt with in the findings.
Defendant does not contest the allegation that its device infringes plaintiff’s patent. It is plain that it does.
Plaintiff’s patent is valid and has been infringed by defendant. The plaintiff is entitled to recover and judgment will be entered to that effect. The amount of recovery will be determined under Rule 38(c).
It is so ordered.
Durfee, Judge; Laramore, Judge; Maddest, Judge, and JoNes, OKief Judge, concur.
FINDINGS OE FACT
The court, having considered the evidence, the report of Trial Commissioner Donald E. Lane, and the briefs and argument of counsel, makes findings of fact as follows:
1. This is a patent suit under the provisions of Title 28, U.S.C., Section 1498. Plaintiff seeks to recover reasonable and entire compensation for unauthorized use and manufacture by or for the United States of equipment described in and covered by United States Letters Patent No. 2,676,586, issued to plaintiff on April 27, 1954, entitled “Blackout-Preventing Device.”
2. On December 4, 1957, the court granted defendant’s motion to dismiss as to parts of the petition, and stated that the petition would stand insofar as it seeks recovery under Section 1498 of Title 28. (140 Ct. Cl. 441, 115 USPQ 354.)
3. On January 27,1959, the parties agreed that the issues of validity and infringement of the Coakwell patent in suit be first determined upon full proofs, findings of fact, and argument of counsel, and agreed that any accounting issue be deferred.
4. Plaintiff Charles A. Coakwell is a citizen of the United States, a resident of Andover, Ohio, and is the sole owner of patent 2,676,586. Plaintiff obtained financial assistance from *202 one A1 Stromberg who advanced a sum of money toward obtaining said patent. It was agreed that expenses of the invention and profits derived from the invention defined in said patent were to be divided equally between Coakwell and Stromberg. Said patent resulted from an application for patent filed in the United States Patent Office on June 24, 1942. Prior to that date, plaintiff was a licensed aircraft pilot and aware of the phenomenon of blackout.
5. The Coakwell patent in suit relates to a device for preventing the effect commonly referred to as “blacking-out”, which effect is caused by sudden change in direction of movement of an aircraft traveling at high speed. The patent specification states:
In maneuvering fast fighting planes during the course of an air battle, sharp banks and turns at high speed are often necessary to escape the fire of enemy craft. But such turns are highly dangerous because sudden changes in the direction of movement of the pilot’s body may so accelerate the flow of blood through the veins leading from the head as to drain the blood from the pilot’s brain to an extent such that the optic nerves are affected and the pilot becomes temporarily blind. The apparent increase in the weight of a body carried by a plane due to its inertia during recovery of the plane from a diving maneuver is commonly referred to as an increase of g and the present invention provides means automatically operative upon an increase of g for impeding the flow of blood from the pilot’s brain to prevent blacking out.
The present invention has for its object to provide acceleration responsive means for retarding the venous flow of blood from the head during sharp turns so as to increase the pilot’s resistance to blacking-out.
A further object of the present invention is to provide a pressure-applying device which is automatically controlled by turning movements of the plane such that there is an increase in the thrust of the pilot’s body against the seat due to inertia.
6. The Coakwell patent drawings illustrate a device for automatically applying pressures to portions of a pilot’s neck while sharp turns are being made, so as to temporarily restrict the flow of blood from the head. Such a device as illustrated in figs. 1 and 3 of the patent drawings, repro *203 duced in the appendix to this report, is described in the patent specification as follows:
* * * * *
The device of the present invention is a device for applying pressure to portions of a pilot’s neck while sharp turns are being made, so as to temporarily restrict the flow of blood from the head and prevent blacking out.
The device of the present invention includes a suitable support for the pressure-applying device which may be in the form of a collar 1 adapted to be secured on the pilot’s neck by means of a suitable quick detachable fastener 2. The collar 1 carries one or more inflatable pads 3 which are so positioned that they are adapted to apply pressure to veins carrying blood from the head. Fluid under pressure is supplied to pads 3 through tubes 4 and 5, which branch from a main pressure-supply tube 6. The fluid employed for inflating the pads 3 is preferably a liquid supplied from a reservoir 7 to which the tube 6 is connected.
The reservoir 7 is in the form of a tubular bellows mounted within a housing 8 which is fixed to a portion of the plane such as the pilot’s seat, or the floor of the cockpit. The bellows 7 has a collapsible tubular wall 9 which may be formed of rubberized fabric and which has spaced restricted portions which are stiffened by spaced hoops 10. The lower end of the wall 9 is secured by means of a clamping ring 11 and bolts 12 to the base 13 of the housing 8. The bellows has an upper movable head 14 to which the upper end of the flexible wall 9 is attached by means of a clamping ring 15 and bolts 16. The head 14 has a central cup-shaped, portion 17 which projects into the bellows 7. A rod 18 is rigidly attached to the bottom of the cup-shaped portion 17, the rod 18 having a reduced lower end 19 which extends through the bottom of the cup-shaped portion 17 and which is threaded to receive a clamping nut 20.
It will be apparent that the compression of the bellows 7 by downward movement of the head 14 will apply pressure to the liquid within the bellows and the tube 6, forcing liquid into the inflatable pads 3 so as to exert pressure against the neck of the pilot. Pressure exerted upon the veins which conduct blood from the head impedes the flow of blood and lessens the tendency of the blood to drain from the head upon sudden change in direction of movement. It is desirable that this pressure be applied during turning movements and it is obvious *204 that such application of pressure may be effected manually if desired. However, in view of the fact that such manual application of pressure might not be convenient for the pilot, it is preferred to provide automatic means responsive to turning movements of the airplane for applying pressure to the liquid.
$ $ $ $ $
7. The Coakwell patent specification describes in detail the device illustrated in fig. 3 with particular reference to automatic operation, adjustment of the position of weight 83 and the flange 36 to control the amount of pressure applied, and limitation of the amount of pressure applied to a predetermined value. The patent teaches:
By the means above described, the pressure exerted by the inflatable pads 3 is automatically applied during turning movements of the plane which tend to cause black-outs and the amount of pressure so exerted is automatically limited so that choking or other undesirable effects are not caused by the actuation of the pressure devices.
‡ *
It will be apparent that the present invention provides a device of simple construction which operates instantly and automatically whenever the plane is turned sharply in such a manner that the blood is caused by its inertia to flow away from the pilot’s head and that the restrictive pressure so applied may be so regulated as to keep it within a safe limit.
It is to be understood that variations and modifications of the specific device herein shown and described for purposes of illustration, may be made without departing from the spirit of the invention.
8. The disclosure of the Coakwell patent taught the art that external pressures applied to restrict the flow of blood within the body should be regulated and automatically limited in order to avoid undesirable effects. The device illustrated in the Coakwell patent will apply an increase in pressure upon an increase in g, the force of gravity during sharp turns at high speeds.
9. Plaintiff relies on claims 2-7 inclusive of the Coakwell patent. These patent claims recite apparatus utilizing fluid pressures for use in aircraft. Claim 2 is reproduced here *205 with indentations and emphasis added to facilitate identity and accurate understanding of the devices covered by the patent.

Patent Claim %

The combination, comprising
(a) constricting means to be worn about a portion of the body of an occupant of an aircraft,
(b) a conduit for conducting a fluid medium under pressure to operate said constricting means,
(c) acceleration responsive means for regulating the pressure of said fluid medium so as to increase the constricting force applied by said constricting means during recovery of said aircraft from a diving maneuver, and
(ax) said constricting means arranged to be positioned about the body of the occupant in such a maimer as to retard upon such increase in the constricting force thereof the drainage of blood from the brain of the occupant,
(a2) whereby during the interval of recovery of the aircraft from said diving maneuver the occupant may be protected from loss of consciousness.
10. Claims 6 and 7 are dependent upon claim 2. Claim 6 specifies that the acceleration responsive means (c) establishes and maintains a pressure in the constricting means (a) that is proportional to the increase in g. Claim 7 adds to claim 2
(d) means * * * for limiting the pressure applied to said constricting means.
11. In applying claim 2 to the embodiment illustrated in figs. 1 and 3 of the Coakwell patent drawings, the constricting means includes the fluid pressure pad 3 carried by the collar 1, the conduit is designated by the reference numeral 6, the acceleration responsive means include the bellows 9 and the weight 33 connected by linkage to compress the bellows, and pad 3 is positioned to retard the flow of blood from the brain, all as specified in claim 2. The downward movement of weight 33 opposed by spring 37 is dependent upon the increase in g as recited in claim 6. The means for limiting the pressure recited in claim 7 includes the bottom of the slot 34 *206 wbicli when engaged by the weight linkage lever 29 prevents further compression of the bellows 9.
12. Claim 5 is somewhat similar to claim 2 but recites added details and means as follows:

Patent Olaim 5

In a system for preventing unnatural blood distribution within a human body which is subjected to forces set up when said body is accelerated in space,
(a) a fluid pressure operated device adapted normally to engage loosely a portion of the human body and adapted when actuated to effect a pressure against blood carrying vessels of the body,
(b) a conduit connected to said device to supply pressure thereto to actuate the same,
(c) inertia means automatically operative in response to said acceleration forces,'
(d) means operated by said inertia means for effecting transmission of pressure through said conduit to said device when said inertia means is operated in response to acceleration forces and for discontinuing the transmission of pressure to said device upon cessation of said acceleration forces,
(e) means for limiting the maximum pressure applied to said fluid pressure operated device, and
(f) adjustable means for increasing or decreasing the maximum pressure applied to said fluid pressure operated device.
13. In applying claim 5 to the embodiment illustrated in figs. 1 and 3 of the Coakwell patent drawings, the means (d) operated by the inertia of weight 33 include lever 29, sleeve 23, rod 18, spring 27, and bellows 9. The means (e) for limiting the maximum pressure is the lower end of slot 34 when engaged by lever 29. The means (f) for adjusting the maximum pressure applied are threaded extension 28 and threaded flange 36 which permit adjustment of the maximum pressure applied to spring 27 when the weight 33 is in its lowermost position. The maximum pressure applied may also be adjusted by shifting the position of the weight 33 along the level 29.
14. Claims 3 and 4 of the patent in suit are not specifically restricted to blackout prevention but do recite the details of the spring mounting of the weight 33.

*207
Patent Claim S

The combination with
(1) a fluid pressure operated device mounted on an aircraft and
(2) means for supflying a fluid medium under pressure to said device,
(3) of means for automatically controlling the pressure of said fluid medium comprising
(a) a weighted member mounted for limited movement in a path fixed with respect to said craft and disposed transversely of the path in which said craft is propelled,
(b) elastic means for exerting a yielding pressure on said weighted member to normally hold said member at one end of its path of movement,
(bC said elastic means being yieldable to permit movement of the weighted member under the increased pressure exerted by said weighted member during changes in the direction of movement of the craft that oppose the momentum of the weighted member to said elastic means,
(c) and means operated by said weighted member for varying the pressure of the fluid medium supplied to said device.
Claim 4 is similar to claim 3 but specifies that the weighted member (a) is mounted for movement toward and away from the floor of the crafty and specifies a sprmg in lieu of elastic means (b).
15. The early development of blackout-preventing devices and equipment includes the following items:
A. On February 2, 1933, Flight magazine contained an article entitled “The Physiological Limitations of Flying”, reporting a lecture by a Royal Air Force officer. This article described the blackout problem as follows:
* * * When, for example, making a properly banked but very sharp turn, or when pulling out of a fast steep dive, it was quite possible to load the body so much that very definite ill-effects were experienced. The most common of these were “blacking out” and “redding out.” The former took place under normal conditions when the centrifugal force acted from the pilot’s head towards *208 his seat, and the latter when the pilot’s head was outwards, as in a “bunt” or outside loop.
These phenomena would appear to occur when forces of about 3y2 to 4 g. were involved, although, of course, pilots varied very much in this respect. This “blacking out” was attributed to anaemia of the eye from the pooling of blood in the relatively unsupported, and gravitationally lower, abdominal vessels. * * *
This article suggested two preventive measures, the first being a pivoted air scoop normally held out of the aircraft slipstream by a spring and being movable into the slipstream by a weight subject to g forces. Air pressure from the projected scoop was to be conducted to an inflatable corset around the pilot’s abdomen for supporting him until such time as the centrifugal force was relieved. The second suggestion was to place the pilot’s seat on a slide to operate a hydraulic ram to give any desired degree of pressure in the pilot’s abdominal corset. A brief article in the magazine Scientific American, August 1933, mentions the pivoted scoop suggestion and expresses a hope that it be put to practical test. There is no evidence that either suggested device was ever built or ever successfully used.
B. On March 12, 1936, Poppen, a flight surgeon of the U.S. Navy, filed an application for letters patent on method and apparatus for controlling the distribution and pressure of certain human body fluids and contents. Patent 2,104,758 was issued thereon to Poppen on January 11, 1938. This Poppen patent discloses an adjustable inflatable abdominal belt to control the volume of the intra-abdominal blood vessels by modifying the intra-abdominal pressure. Figs. 1 and 5 of the Poppen patent drawings are reproduced in the appendix to this report. The specification of this Poppen patent teaches that under certain conditions the blood volume of the abdomen may increase at the expense of the general circulation of the body, and that the symptoms encountered are the result of impaired circulation in other parts of the body, e.g., the brain. The Poppen patent teaches that pressure may be applied to an elastic bag held in the abdominal corset for inflating the bag to distribute the con *209 tained pressure evenly over the abdominal region. The specification states:
It is to be understood that a constant pressure within the elastic bag is capable of being controllably maintained from a gaseous source of supply, such as an air flask, suitably connected to the elastic bag by means of a quick release fitting and control valve assembly, operated either manually, automatically, or a combination of both.
This prior Poppen patent was cited in the Coakwell patent application file and considered by the Patent Office examiner before allowance of the patent claims here in suit.
C. On September 18, 1940, Beall filed an application for letters patent on a pressure producing apparatus, and patent 2,335,474 issued thereon to Beall on November 30, 1943. This Beall patent discloses a pressure suit for preventing-blackout. Fig. 1 of the Beall patent drawings is reproduced in the appendix of this report. The apparatus includes a body fitting garment having fluid-containing sacks or compartments in pressure contact relation with the body, and includes a helmet to which high and low pressures may be alternatively applied to aid breathing. As shown in fig. 1, the garment 10 includes relatively narrow fluid pressure producing sack members, such as indicated by the numeral 13, substantially coextensive with arm, leg, and body portions. The sacks 13 may be filled with liquid, such as water, from a reservoir 14. The helmet 17 may be connected with a reservoir 22 containing gas or oxygen. The neckband 19 is provided to seal the helmet 17 to the garment 10 or to the neck, rather than to apply constrictive pressure against blood vessels in the neck. Manually operated valves 16 and 31 provide for admitting and draining water to and from the sacks 13, and a pump 33 returns drained water to the reservoir 14. The Beall patent specification states:
* * * The garment contains or includes fluid pressure sack members or compartments, 13-13, constructed and arranged to apply external pressure on any desired parts or portions of the aviator’s body. These sack members may be filled with gas or liquid to create the desired pressure.
This pressure may be by these means either separately or in combination but it is preferable to use water or *210 other similar liquid, having approximately the same specific gravity as the human body. It will be noted that if a compartment is filled with water, a quessure will be created within the sack which will be proportional to the depth of the liquid, and when the liquid has a height corresponding to the height of the body, a pressure will be created equal to the gravitation component of the pressure of the blood within the body. If this sack or compartment member is constrained by reason of the garment, it will create a pressure entirely around the body member equal to the pressure in the sack at this point and will operate in the same manner as though the liquid containing member completely surrounded the body.
Whichever position the aviator may assume, the sack will assume a corresponding position as it is in pressure contact with his body, and the vertical height of the water column within the suit will be approximately the same as the gravitational component of the blood pressure within his body.
When the aviator so maneuvers as to create acceleration due to centrifugal force or by other means, changes in pressure are produced within the suit which will correspond to those changes of pressure which are produced within the aviator’s body, and they will neutralize each other. * * *
This Beall patent issued after the Coakwell patent application was filed and is mentioned in the Coakwell patent application file.
D. On November 1, 1940, I. R. Versoy and L. H. Loeffel filed an application for letters patent on an aviator’s belt to support the abdomen and spine during aircraft maneuvers. Patent 2,397,109, which issued April 2, 1946, on this application, discloses a belt or protective garment provided with built-in bladders or air cushions. The cushions are. adapted to be inflated when air is blown into a filler tube. This patent does not disclose the air pressures to be used and does not disclose automatic control of the pressure or pressure changes proportional to g.
E. On September 13, 1941,1. R. Versoy and L. H. Loeffel filed an application for letters patent on an acceleration belt and stockings for aviators. Patent 2,397,710, which also issued April 2, 1946, on this application, discloses an aviator’s garment including stockings or leggings in addition *211 to the belt shown in patent 2,397,709. The 2,397,710 patent discloses the nse of a source of air pressure and a pressure relief valve to provide an air pressure of approximately two pounds in the bladders of the stockings and belt. The bladders are inflated upon manual actuation of a valve by the aviator. This patent does not disclose automatic control of pressures to values proportional to increases in g.
F. During late 1941 and early 1942, Thomas Ferwerda, a flight surgeon, U.S. Navy, and others employed by defendant became engaged in the development and testing of experimental pneumatic stockings and belts for aviators, and also with valve devices for use with such garments. The equipment tested at the Naval Air Station, Anacostia, D.C., during said period included constant pressure garments and massaging pressure suits. Additional experiments with anti-blackout devices took place during March and April 1942, utilizing centrifuge apparatus near Toronto, Canada. During October and November 1942, experimental flight tests were made from the Naval Air Station, Jacksonville, Florida. The equipment tested in Canada included a massaging pressure antiblackout suit and a general pressure anti-blackout suit. Mr. Ferwerda’s report dated April 27, 1942, concerning the centrifuge tests in Canada, states:
(6) The general pressure type of anti-blackout gear is not sufficiently developed to warrant flight testing.
sjt sf:
(9) Modify existing contract for 15 general pressure suits to provide 5 suits with 2" bladders, 5 suits with 3" bladders, and 5 suits with 4" bladders. The 15 suits to be equipped with one set of G valves to provide satisfactory operation.
At least some of the reports on Ferwerda’s experimental work with antiblackout equipment done during 1942 were classified “confidential.” These reports were declassified ten years later on July 8, 1952. On August 26, 1944, over two years after the Coakwell application for letters patent was filed, Ferwerda filed an application for patent, S.N. 551,414, which resulted in Ferwerda patent 2,760,484, issued August 28, 1956. This Ferwerda patent discloses an automatic pressure control valve for antiblackout suits, the valve *212 being operable upon an increase in g. While pending, the Ferwerda patent application was involved in an interference proceeding in the Patent Office with the Coakwell patent application and other patent applications. The Patent Office interference decision was favorable to Coakwell. Counsel for Ferwerda then, defendant’s counsel here, sought by a suit filed in the United States District Court, N.D. Ohio, E.D., to contest the Patent Office award of priority to Coak-well. The District Court dismissed the complaint, since it was filed too late, and overruled reconsideration. Ferwerda et al. v. Coakwell, 121 F. Supp. 334, 102 USPQ, 162, affirmed by United States Court of Appeals, 6th Circuit, 220 F. 2d 752, 105 USPQ 388 (1955). The test activities engaged in by Ferwerda and others associated with him prior to June 24, 1942, the filing date of the Coakwell patent application, were experimental, and do not warrant a finding that said activities constitute such prior knowledge, invention, and/or use as would anticipate or invalidate the Coak-well patent claims here in suit.
16. The records of the United States Patent Office show that claim 2 of the Coakwell patent, reproduced in finding 9, was originally suggested to Coakwell by the Patent Office examiner. On March 28,1946, the Coakwell patent application was ready for the formal allowance of one claim, now claim 1 of the patent. On that date the Patent Office examiner suggested to Coakwell the patent claim which is now claim 2 of the Coakwell patent and here in suit. Coakwell adopted the suggested claim and his pending application became involved in two-party Interference 82,447 with an application of one David Gregg, assignor to Bendix Aviation Corporation. On September 8, 1947, the decision in Interference 82,447 was favorable to Coakwell, and the decision was affirmed June 28, 1949, by the U.S. Court of Customs and Patent Appeals. Gregg v. Coakwell, 175 F. 2d 575, 82 USPQ 201 (1949). On March 27, 1950, the pending Coak-well patent application became involved in four-party Interference 84,391, with the patent application of Thomas Ferwerda, identified in finding 15F, a joint application of I. R. Versoy and A. D. Rapuano, and a joint application of H. W. Wilder and D. M. Clark. The subject matter of this second interference was again the suggested claim, now claim *213 2 of tbe Coakwell patent in suit. On June 30, 1953, tbe decision in Interference 84,391 was favorable to Coakwell. Fer-werda’s attempt to appeal to tbe United States District Court failed, as stated above.
17. Claims 3 and 4 of tbe Coakwell patent, discussed in finding 14, were added to tbe Coakwell patent application on August 30,1946, during tbe pendency of tbe two-party interference. These two claims are specific to a means for tbe automatic control of fluid pressure in accordance with movement of a spring-biased weight responsive to changes in tbe direction of movement of the aircraft. These two claims were allowed by the Patent Office examiner without rejection. Claims 5, 6, and 7 of tbe Coakwell patent, discussed in findings 12 and 10, respectively, were added to the Coakwell patent application on November 12,1953, after tbe termination of the four-party interference. Claim 5 is more limited than claim 2 which Coakwell won in the interferences. Claims 6 and 7 are claims dependent on claim 2. Claims 5,6, and 7 were allowed by the Patent Office examiner without rejection.
VALIDITY ISSTOE
18. Defendant has contended that all the patent claims in suit are invalid in view of prior patents, publications, and knowledge or invention by others. At the trial, defendant offered copies of the following patents and publications dated prior to the June 24,1942, filing date of the Coakwell patent application:
Montreuil_ 1,268,597_June 4, 1918
Hopkins et al_ 1,737,588_December 3, 1929
Meredith_ 1,766,300_June 24,1930
Flight- pp. 99-100_February 2, 1933
Scientific American_p. 80_August 1933
Poppen_ 2,104,758_January 11, 1938
Horton (Filed 12/3/40)_ 2,309,591_January 26,1943
Beall (Filed 9/18/40)_ 2,335,474_November 30, 1943
19. Montreuil patent 1,268,597 discloses a conserving valve for steam heating systems. This valve is provided with adjustable mechanical devices such as a weight, or a weight associated with a spring. The Montreuil valve is described for maintaining an initial operative steam pressure on the supply side of the valve by automatically shutting off the *214 delivery of steam to a heating system until the initial steam pressure builds up to a predetermined minimum. The Mon-treuil patent does not mention use of such a valve with aviators’ antiblackout suits and does not mention the effect of any variations in g forces.
20. Hopkins et al. patent 1,737,588 discloses an incased adjustable weight-loaded valve adapted to prevent siphonic action in a pipe line between an oil supply tank and an oil burner. The patent does not refer to antiblackout suits or to g forces.
21. Meredith patent 1,766,300 discloses marine escape equipment including a waterproof elastic helmet having an upwardly directed neckband. When air or oxygen is admitted into the helmet, the band exerts a gentle pressure against the neck of the user while he is under water. The Meredith patent does not relate to antiblackout equipment and does not mention variations in g forces.
22. The Flight article, mentioned briefly in finding 15A, suggests and illustrates two ideas for preventing blackout of aviators. Fig. 1 discloses a pivotally-mounted air scoop, balanced by a spring and a weight. The scoop is adapted to swing outward from the floor of an aircraft into the aircraft slipstream when certain g forces are encountered. Air caught in the projecting scoop is conducted to an inflatable corset surrounding the pilot’s abdomen. The article states that unless means are incorporated for releasing the slipstream pressure on the projected scoop, the device would be unstable and when the scoop was once out, the slipstream would keep it out. The air pressure caught in such a scoop would depend on the air speed and would not be proportional to variations in g forces. Fig. 2 discloses an alternative suggestion in which the pilot sits upon an air cushion connnected to an inflatable corset around the pilot’s abdomen. The pressure produced by such a device would depend on the pilot’s individual weight as well as g. The Flight publication discusses the problem as follows:
* * * We therefore offer an alternative suggestion which, although crude, at least has the merit of being entirely automatic and self-regulating (see Fig. 2). In practice we imagine that a better means of operation would be for the pilot’s seat to be mounted upon slides *215 in such a way that centrifugal force would act upon it, and it would, by its motion, work a hydraulic ram situated behind it. This ram could, by a system of levers and graduated rams, be arranged to give any desired degree of pressure in the corset. A regulating valve would have to be included in the specification, for unfortunately the 3y2 g. of some pilots we know, would be far greater than others! (The surface loadings would probably be about the same! — Ed.) Incidentally, it should not be impossible to incorporate a hand pump in the system, which would act on the bottom of the ram, with a by-pass to short circuit the belt, and thus provide an adjustable seat for landing or observation purposes.
The ideas suggested in this publication do not constitute a satisfactory disclosure of a practical device for automatically regulating the pressure of a fluid medium so as to increase the constricting force applied by the constricting means during recovery of aircraft from a diving maneuver. Likewise the publication disclosure does not teach maintaining the pressure proportional to an increase in y, nor teach means for limiting the pressure applied.
23. The Scientific American article is another description of the pivotally-mounted air scoop suggestion illustrated in fig. 1 of the Flight article mentioned above. This description is cumulative to that published in Flight and concludes with hope that the device will soon be put to a practical test.
24 Poppen patent 2,104,758 discloses an abdominal belt to control the volume of intra-abdominal blood vessels by modifying the intra-abdominal pressure. As noted in finding 15B, the Poppen patent discloses that constant pressure may be maintained in the belt by an air flask and control valve assembly. This patent does not teach pressure regulation to automatically increase the pressure upon increases in g, nor does it teach maintaining proportional pressures or limiting pressures. The Poppen pressure belt is disclosed as useful to reduce pooling of blood in the portal system of the abdominal cavity, and to thereby reduce conditions which may cause shock, syncope, fainting, hernia, nervous stimulation, seasickness, and the like. This Poppen patent was known to and cited by the Patent Office examiner during the pendency of the Coakwell application for patent.
*216 25. Horton patent 2,309,591, resulting from an application filed in the Patent Office on December 3,1940, discloses a fuel feeding system for conveying fuel to a vehicle engine. The Horton system includes an automatic valve for varying the pressures applied to operate a fuel pump. The valve is responsive to changes in the pressure of the operating fluid as well as to changes in the inclination of the vehicle and changes in the acceleration and deceleration of the moving vehicle. This patent does not mention blackout prevention nor does it suggest an automatic pressure regulating valve to increase a pressure proportional to increases in g. The Horton valve is such that when the vehicle travels down an incline and/or decelerates, the pendulum swings to decrease the pressure applied to the fuel pump.
26. Beall patent 2,335,474, resulting from an application for patent filed September 18, 1940, discloses a pressure producing apparatus said to eliminate or reduce blackout. The Beall patent disclosure is reported in detail in finding 15C above. This Beall patent was known to the Patent Office examiner and was mentioned in the examiner’s action of October 19, 1949, paper 18 in the Coakwell application file, defendant’s exhibit 6 herein.
27. Defendant has contended that claim 2 of the Coakwell patent is invalid in view of (1) the Flight article and the Scientific American article alone, or (2) the Poppen patent abdominal belt combined with the Flight or the Scientific American air scoop, or (3) the Horton patent valve combined with the abdominal belts of Flight, Scientific American, or Poppen, or (4) the Montreuil patent valve combined with any one of said abdominal belts, or (5) the Hopkins patent valve combined with any one of said abdominal belts. Claim 2, set forth in finding 9, recites a combination including means for regulating the pressure of the fluid medium so as to increase the constricting force applied. The Coak-well patent illustrates as an example of such means a bellows operated by a weighted lever to increase the pressure of the fluid medium. The air scoop disclosed in Flight or Scientific American is not a regulating means- Such a scoop merely collects air under pressure determined by flight speed rather than g forces. The Poppen patent describes an abdominal *217 belt for use with constant pressure rather than with a regulated increasing pressure. None of the referenced prior patents and publications teach one having ordinary skill in the art of flying that it would be useful to combine the Horton engine fuel control valve, or the Montreuil steam conserving valve, or the Hopkins heating fuel valve with the Flight, Scientific American, or Poppen patent belts. Any such combination is obvious only by hindsight after having knowledge of the Coakwell patent teaching. Claim 2 is valid over the referenced prior patents and publications taken alone or in any attempted combination. Such combinations were not obvious to defendant’s research officer Ferwerda who was still attempting to develop and perfect a satisfactory regulating means when the Coakwell application was filed June 24,1942.
28. Claims 6 and 7 in suit, dependent on claim 2 and more specific than claim 2, as noted in finding 10, are likewise valid over the referenced prior patents and publications and over the various combinations thereof suggested by defendant.
29. Defendant has contended that claim 3 of Coakwell is invalid in view of the inflatable belts of Flight, Scientific American or Poppen, plus the weighted lever and spring of the Horton engine fuel valve, or the Hopkins heating fuel valve, or the weighted arm and spring of the Montreuil steam valve. Such combinations of fuel or heating valve devices with aviators’ belt devices were not obvious at the time the Coakwell application was filed, and claim 3 is valid over said prior patents and publications. Claim 4, which is similar to claim 3, as pointed out in finding 14, is likewise valid over said prior art.
30. Defendant has contended that claim 5 of Coakwell is anticipated by the belts of Flight, Scientific American, and Poppen, along with the Plopkins, Horton, and Montreuil valves. This claim, set forth in finding 12, is similar to claim 2 and details adjustable means for limiting the maximum pressure applied. Claim 5 is valid over any combination of said belt disclosures and said valve disclosures.
31. Defendant has contended that each of the several patent claims in suit is also anticipated by the alternative structures briefly suggested in the Flight article. The alternative sug *218 gestions, noted in finding 15A, include a pilot’s seat cushion or a slidable seat connected to a ram. Any application of the Coakwell claim language to any such vague suggestions involves consideration of the weight of the pilot himself as the acceleration responsive means or the weighted member or the inertia means, and also involves the addition of adjustable check valves and/or other limiting means. The alternative suggestions as briefly disclosed in the Flight article are not adequate to teach or to anticipate the patent claims in suit.
32. The patent claims in suit are not indefinite, vague or misleading. The structural items recited in the patent claims are clearly defined and their relationships are clearly stated. The particular embodiment of the Coakwell invention illustrated and described in the Coakwell patent relates generally to a construction for the application of pressures to a pilot’s neck. Claim 1, not here in suit, specifically recites a device engageable with the pilot’s neck. Claims 2-7 inclusive, here in suit, do not include any such limitation and are not limited to apparatus engageable with a pilot’s neck. The testimony to the effect that pressures applied to a pilot’s neck might be ineffective to prevent blackout or might be fatal to a pilot is inconclusive and does not warrant finding that the Coakwell disclosure and patent claims are misleading.
33. The structure defined in the patent claims in suit was not obvious to one having ordinary skill in the art as of June 24, 1942, and having knowledge of the disclosures of any and/or all of the prior patents and publications listed in finding 18. In the Patent Act of 1952, Congress recognizes as the standard of patentability the unobviousness of the invention, at the time it was made, to a person having ordinary skill in the art. See Title 35, U.S.C., Section 103. Claims 2-7 inclusive of Coakwell patent 2,676,586 are patentable and valid.
INFRINGEMENT ISSUE
34. Defendant has admitted that during the 6-year period preceding the filing of this suit defendant used automatic pressure regulating valves identified as model M-2, type M-4, and type M-8, for inflating antiblackout suits. Defendant’s manual “Survival Training and Personal Equip *219 ment”, AFM 64-4, dated October 1954, states on pages 189 and 190:
One of three different waives may be installed in aircraft for inflating g-snits, depending on the source of compressed air available.
In aircraft with reciprocating engines the instrument vacuum pump supplies air at relatively low pressure to an M-2 anti-g valve.
This valve opens at 2.75 g’s and delivers air at a pressure of approximately 1 psi for each g above 2.75. If jettison able gas tanks are 'being pressurized through a special port on this valve, the valve opens at 4 g’s instead of 2.75, but only when the tanks are still attached.
The M-4 valve illustrated on the preceding page is used in those jet aircraft in which air from the final stage of the engine compressor, which is used to supply the valve, does not exceed a pressure of 125 psi or a temperature of 250° F.
The M-8 valve may be used in any jet aircraft, and may be supplied from any source of pressure greater than 10 psi and less than 350 psi with temperature no higher than 400° F. at the valve. It was designed specifically for use in the higher-powered jet aircraft. In contrast to the M-4, it has only a negligible air leakage into the cockpit. Note the preceding illustration of the M-8 valve.
Both valves operate in essentially the same manner and can be actuated from the cockpit in a similar manner.
When subjected to sufficient downward accelerative force (g), weights in the upper part of the valve press downward, closing off the connection between the g-suit and the cockpit air and opening the connection between the suit and the pressurized air source. The suit then inflates rapidly until sufficient pressure is built up to lift the weights and close the pressure-input valve. When the g-force decreases, the pressure in the suit, with the aid of a small spring, lifts the weights further and vents the air in the suit into the cockpit. These valves not only are activated by the g-force, but automatically adjust the pressure delivered to the suit in accordance with the g-force present.
35. The model M-2 automatic pressure regulating valve for antiblackout suits is illustrated, for example, in figs. 1 and 2 of U.S. Patent 2,620,791, issued December 9, 1952, in the name of I. R. Versoy et al. This patent issued on *220 the same Yersoy et al. application involved in Interference 84,391, noted in finding 16 and in which claim 2 here in suit was awarded to Coakwell. Figs. 1 and 2 of the Yersoy patent drawings are reproduced in the appendix to this report. Referring to said illustrations of the M-2 valve, the acceleration responsive weight 47 is movable downward to seat valve 40 to control the fluid pressure from inlet 22 that passes from outlet 39 to constricting bladders in the aviator’s antiblack-out suit, as recited in claim 2 in suit. The bellows 44 and the adjustable spring 48 serve to maintain a pressure proportional to the increase in g as recited in claim 6. The M-2 valve device also includes a weighted member 31 mounted for limited movement, a yieldable elastic spring 33 normally holding the weight raised, and valve means 24 operated by the weight for varying the pressure passed to the anti-blackout suit, all as recited in claims 3 and 4 in suit. The M-2 automatic pressure regulating valve used in conjunction with defendant’s antiblackout suit includes all the parts and elements set forth in claims 2,3,4, and 6 here in suit and these parts and elements operate in the same manner to produce the same result. Claims 2, 3, 4, and 6 of the Coakwell patent ha suit are infringed by defendant’s M-2 regulating valve and antiblackout suit.
36. The type M-4 automatic pressure regulating valve for antiblackout suits is illustrated, for example, in fig. 10 of United States patent 2,617,408, issued November 11,1952, to David M. Clark, the same D. M. Clark identified in finding 16 as a joint applicant on an application involved in four-party Interference 84,391, in which claim 2 in suit was awarded to plaintiff here. Figs. 10 and 11 of Clark 2,617,408 are reproduced in the appendix to this report. Referring to the illustrations, the M-4 automatic pressure regulating valve includes an acceleration responsive weight 31 for regulating by valve 90 the pressure of air entering at inlet conduit 35 from a supply tank, and conducted to an antiblackout suit by a conduit connected to outlet 37. The M-4 valve is connected to constricting bladders, as illustrated in fig. 11 of the Clark patent, for regulating the pressure of a fluid, such as air under pressure, so as to increase the constricting force during recovery of an aircraft from a diving maneuver, as *221 recited in Coakwell claim 2. The M-4 construction includes a chamber 57 subjected to atmospheric pressures and includes a spring 44, both of which function to cause the acceleration responsive weight 31 to maintain a pressure proportional to the increase in g as recited in claim 6. The M-4 construction as used by defendant includes a pressure relief or limit valve, described in paragraph 3-18 of Air Force Handbook for Type M-4 Pressure Regulating Valve, as recited in claim 7 in suit. The M-4 valve construction includes a weighted member 31 mounted for limited movement, a yieldable elastic spring 44 normally holding the weight raised, and valve means 90 operated by the weight for varying the pressure supplied to the antiblackout suit, all as recited in claims 3 and 4 in suit. The M-4 automatic pressure regulating valve used in conjunction with defendant’s antiblackout suit includes all the parts and elements set forth in claims 2, 3,4, 6, and 7 here in suit, and these parts function in the same manner to produce the same result. Claims 2, 3, 4, 6, and 7 of the Coakwell patent in suit are infringed by defendant’s M-4 regulating valve and antiblackout suit.
37. The type M-8 Anti-G Suit valve is illustrated in ARO Equipment Company drawing 902033, dated January 19, 1951, and also in Air Force Handbook for Anti-G Suit Valve USAF Type M-8. A portion of drawing 902033 is reproduced in the appendix to this report. Referring to said illustration of the accused M-8 valve, the acceleration responsive weight W is movable downward to operate valves Vi and V2 to regulate the fluid pressure from inlet I that is maintained in outlet O connected to constricting bladders in an aviator’s antiblackout suit, as recited in claim 2. The diaphragm assembly D and an adjustable spring S cause the valves to maintain a pressure proportional to the increase in g as recited in claim 6. The M-8 construction includes a pressure relief or limiting valve R for limiting the pressure applied to the constricting means as recited in claim 7. The M-8 construction provides a weighted member W mounted for limited movement, a yieldable elastic spring S normally holding the weight raised, and a valve means Vi and V2 operated by the weight for varying the pressure applied to the antiblackout suit, all as recited in claims 3 and 4. The *222 M-8 construction includes a conduit O, inertia means W, valve means Vi and V2 for effecting the transmission of pressure in response to the action of acceleration forces, relief valve means E for limiting the applied pressure, and means for adjusting the pressure at which the relief valve E operates, all as recited in claim 5. The M-8 Anti-G Suit valve used in conjunction with defendant’s antiblackout suit includes all the parts and elements set forth in claims 2-7 inclusive, and those parts function in the same manner to produce the same results. Claims 2-7 inclusive of the Coak-well patent in suit are infringed by defendant’s M-8 regulating valve and antiblackout suit.
38. Summarizing, each of claims 2 to 7 inclusive of Coak-well patent 2,676,586 have been infringed by defendant’s unlicensed use of the invention or inventions defined in said patent claims. The infringing equipment includes certain regulating valve devices identified as model M-2, type M-4, and type M-8, together with antiblackout suits, as specifically set forth in findings 34 through 37. Each of claims 2 to 7 inclusive of Coakwell patent 2,676,586 is valid over the prior publications, patents, uses, and knowledge asserted by defendant herein.
CONCLUSION OF LAW
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes as a matter of law that the plaintiff is entitled to recover and judgment will be entered to that effect. The amount of recovery will be determined under Eule 38(c).

*0

 It should be stated that the cause of action in Morgan v. Daniels, supra, originated in the District Court. Such actions are tried de novo ; whereas, an appeal to the Court of Customs and Patent Appeals is heard on the record in the Patent Office alone. Since the Morgan case was tried de novo, the decision of the Patent Office could not be accorded finality.